# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| OSITANACHI OTUGO, Individually and on Behalf of All Others Similarly Situated, 14301 Wilshire Court Laurel, Prince George's Co., MD 20707<br><br>Plaintiff,<br><br>v.<br><br>SUCAMPO PHARMACEUTICALS, INC., 805 King Farm Boulevard, Suite 550 Rockville, Montgomery Co., MD 20850,<br><br>PETER GREENLEAF., 805 King Farm Boulevard, Suite 550 Rockville, Montgomery Co., MD 20850,<br><br>PAUL EDICK, 805 King Farm Boulevard, Suite 550 Rockville, Montgomery Co., MD 20850,<br><br>JOHN H. JOHNSON, 805 King Farm Boulevard, Suite 550 Rockville, Montgomery Co., MD 20850,<br><br>MAUREEN E. O'CONNELL, 805 King Farm Boulevard, Suite 550 Rockville, Montgomery Co., MD 20850,<br><br>ROBERT J. SPIEGEL, 805 King Farm Boulevard, Suite 550 Rockville, Montgomery Co., MD 20850,<br><br>TIMOTHY P. WALBERT, 805 King Farm Boulevard, Suite 550 Rockville, Montgomery Co., MD 20850,<br><br>and<br><br>KAREN SMITH, 805 King Farm Boulevard, Suite 550 | Case No.: _____<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**DEMAND FOR JURY TRIAL** |

Rockville, Montgomery Co., MD 20850,

Defendants.

Plaintiff Ositanachi Otugo ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## **NATURE OF THE ACTION**

1.      This is a class action brought by Plaintiff on behalf of himself and all other similarly situated public stockholders of Sucampo Pharmaceuticals, Inc. ("Sucampo" or the "Company") against Sucampo and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants," and, together with Sucampo, the "Defendants") for their violations of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-9"), and to enjoin the expiration of a tender offer (the "Tender Offer") on a proposed  transaction (the "Proposed Transaction"), pursuant to which Sucampo will be  acquired by Mallinckrodt plc ("Mallinckrodt") through its wholly owned subsidiary, Sun Acquisition Co.

2.      On December 26, 2017, Sucampo and Mallinckrodt issued a joint press release announcing that they had entered into a definitive agreement (the "Merger Agreement").  Pursuant to the terms of the Merger Agreement, Acquisition Sub will commence a cash tender offer to acquire all of the issued outstanding shares of Sucampo common stock for $18.00 per share (the "Offer Price").  The Tender Offer is valued at approximately $1.2 billion.

3.      On January 16, 2018, in order to convince Sucampo stockholders to tender their

shares, the Board authorized the filing of a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement (the "14D-9") with the Securities and Exchange Commission ("SEC").  In particular, the 14D-9 contains materially incomplete and misleading information concerning: (i) financial projections for the Company; and (ii) the valuation analyses performed by the Company's financial advisor, Jefferies LLC ("Jefferies"), in support of their fairness opinions.

4.      The Tender Offer is set to expire at 8:00 A.M., Eastern Time, on February 13, 2018 (the "Expiration Date").  It is imperative that the material information that has been omitted from the 14D-9 is disclosed to the Company's stockholders prior to the forthcoming Expiration Date so they can properly determine whether to tender their shares.

5.      For the reasons, and as set forth in detail herein, Plaintiff seeks to enjoy the Defendants from closing the Tender Offer or taking any steps to consummate the Proposed Transaction, unless and until the material information discussed below is disclosed to Sucampo stockholders, or in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of 14(d)(4), 14(e) and 20(a) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

7.      This Court has jurisdiction over the Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of

jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  Sucampo is incorporated in Delaware and is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

9.      Plaintiff is, and has been at all times relevant hereto, a common stockholder of Sucampo.

10.     Defendant Sucampo is a Delaware corporation with its principal executive offices located at 805 King Farm Blvd., Suite 550, Rockville, Maryland 20850.   Sucampo is a biopharmaceutical company focused on the development and commercialization of pharmaceutical products.    The Company's primary focus areas are gastroenterology, ophthalmology, and oncology-related disorders.   Sucampo common stock is traded on the NASDAQ under the ticker symbol "SCMP".

11.     Defendant Peter Greenleaf is, and has been since March 2014, a director of Sucampo and the Company's Chief Executive Officer, and since January 2016 has served as the Chairman of the Board.

12.     Defendant Paul Edick is, and has been since July 2016, a director of Sucampo.

13.     Defendant John H. Johnson is, and has been since December 2014, a director of Sucampo.

14.     Defendant Maureen E. O'Connell is, and has been since February 2013, a director

of Sucampo.

15.     Defendant Robert J. Spiegel M.D., FACP is, and has been since January 2015, a director of Sucampo.

16.     Defendant Timothy P. Walbert is, and has been since October 2015, a director of Sucampo.

17.     Defendant Karen Smith is, and has been since July 2017, a director of Sucampo.

18.     The parties in paragraphs 11 through 17 are referred to herein as the "Individual Defendants" and/or the "Board," collectively with Sucampo the "Defendants."

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Sucampo (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

20.     This action is properly maintainable as a class action because:

(a)     the Class is so numerous that joinder of all members is impracticable.  As of October 26, 2017, there were 46.64 million shares of Sucampo common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public stockholders of Sucampo will be ascertained through discovery;

(b)     there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i.       whether Defendants have misrepresented or omitted material

information concerning the Proposed Transaction in the 14D-9, in violation of Sections 14(d)(4) and 14(e) of the Exchange Act;

ii. whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii. whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to tender their shares based on the materially incomplete and misleading 14D-9.

(c) Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d) Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f) Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## **SUBSTANTIVE ALLEGATIONS**

**I.    Company Background and the Proposed Transaction**

21.     Sucampo, incorporated on December 9, 2008, is a biopharmaceutical company focused on the development and commercialization of pharmaceutical products.  The Company's primary focus areas are gastroenterology, ophthalmology, and oncology-related disorders.

22.     On December 26, 2017, Sucampo issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

**Mallinckrodt to Acquire Sucampo Pharmaceuticals for Approximately $1.2 Billion**

**— Immediately accretive transaction includes development and commercial assets including AMITIZA® (lubiprostone), a leading product in branded constipation market —**
**— Mallinckrodt expects accretion to 2018 adjusted diluted earnings per share of at least $0.30; and at least double that in 2019, assuming expected first quarter 2018 close —**
**— Mallinckrodt to commence cash tender offer for $18.00 per share, with support from key Sucampo shareholders —**

STAINES-UPON-THAMES, United Kingdom and ROCKVILLE, Md., Dec. 26, 2017 /PRNewswire/ — Mallinckrodt plc (NYSE: MNK), a leading global specialty pharmaceutical company, and Sucampo Pharmaceuticals, Inc. (NASDAQ: SCMP), a global biopharmaceutical company, today announced that they have entered into an agreement under which Mallinckrodt will acquire Sucampo, including its commercial and development assets. The transaction was approved by the Boards of Directors of both companies.

"Mallinckrodt's acquisition of Sucampo is the latest milestone towards our vision of becoming an innovation-driven specialty pharmaceutical growth company focused on improving outcomes for patients with severe and critical conditions," said Mark Trudeau, Chief Executive Officer and President of Mallinckrodt. "The acquisition brings near-term net sales and earnings accretion through AMITIZA and bolsters our pipeline in rare diseases with VTS-270 and CPP-1X/sulindac. We look forward to adding the Sucampo portfolio and welcoming members of its team to Mallinckrodt."

"This transaction is a testament to the hard work and dedication of Sucampo's employees. Together we have made extraordinary progress in our mission to provide options for patients affected by diseases with few or no current treatment options, and to their caregivers and physicians. We believe that this transaction with Mallinckrodt represents significant value for shareholders," said Peter Greenleaf, Chairman and Chief Executive Officer of Sucampo. "With the addition of its significant resources and expertise, we believe

Mallinckrodt is a natural partner to accelerate the development of our rare disease assets in NPC and FAP, and to continue to provide AMITIZA for patients suffering from constipation-related disorders."

### Sucampo's Commercial Assets

*AMITIZA® (lubiprostone)*, a leading global product in the branded constipation market, is approved by the U.S. Food and Drug Administration (FDA) for treatment of chronic idiopathic constipation (CIC) in adults, irritable bowel syndrome with constipation (IBS-C) in women 18 years of age and older, and opioid-induced constipation (OIC) in adult patients with chronic, non-cancer pain, including patients with chronic pain related to prior cancer or its treatment who do not require frequent opioid dosage escalation. AMITIZA is a chloride channel activator which increases fluid secretion and motility of the intestine, facilitating passage of stool. The FDA is currently reviewing a supplemental New Drug Application (sNDA) for AMITIZA in children 6 to 17 years of age with pediatric functional constipation (PFC). The sNDA received a Priority Review designation and has a user fee[1] goal date of January 28, 2018.

Roughly 40 million patients in the U.S. suffer from some form of chronic constipation. While the most common treatments include over-the-counter laxatives, branded prescription drugs hold about 10% of the total chronic constipation market, resulting in approximately 4.2 million prescriptions and annual growth of 10% to 15% [2]. In 2016, net sales of branded products for treatment of CIC, OIC and IBS-C were $1.6 billion[3], with AMITIZA holding approximately 30% of those net sales. Of the branded products currently marketed, only AMITIZA is approved for three constipation indications in the U.S. The drug is promoted through commercial agreements in the U.S., the United Kingdom and Switzerland (all through Takeda Pharmaceutical Company Ltd.), and in Japan (Mylan N.V.). An Investigational New Drug Application for the product has been accepted in China (Harbin Gloria Pharmaceuticals Co., Ltd.). Reported 2016 global net sales of AMITIZA equaled $456 million. If approved for PFC in the first quarter of 2018, AMITIZA would be the first and only approved prescription therapy available to treat children with PFC, a condition which affects approximately 18%[4] of the pediatric population.

*RESCULA® (unoprostone isopropyl ophthalmic solution) 0.15%,* is indicated for ocular hypertension and open-angle glaucoma, and marketed in Japan. Mallinckrodt will acquire global rights to the product, with annual net sales of approximately $9 million.

### Sucampo's Development Assets

*VTS-270* is in Phase 3 development for Niemann-Pick Type C (NPC). NPC is a rare, neurodegenerative, and ultimately fatal disease that can present at any age. NPC is caused by mutations in either the NPC1 or NPC2 genes, resulting

8

in the disruption of the trafficking of intracellular cholesterol, leading to intracellular lipid accumulation in various tissues, including the brain, liver, and spleen [5,6,7,8,9,10,11,12]. NPC presents with neurologic and visceral features that overlap with other diseases often leading to a missed or delayed diagnosis. Neurodegenerative presentation in NPC is a major driver of morbidity and mortality[13,14,15,16,17]. On average, patients die 12.6 years from the onset of neurological symptoms[18]. There are four main types of the disease – types A, B, C1 and C2; NPC encompasses types C1 and C2, which represents 95% of cases[19] and causes accumulation of cholesterol and other lipids in cells, resulting in severe neurological, systemic or psychiatric disorders. Manifestations of the genetic disorder typically occur in childhood[5,6], with occasional late onset, and average diagnosis at ten years of age[20]. NPC is usually fatal, and the majority of cases lead to death before age 20[5,6]. Diagnosis is challenging due to the variability of symptoms[6], which could improve with awareness created by a new treatment option. Worldwide estimated prevalence for the rare disease is approximately 2,000 to 3,000 patients, with about 500 cases in the U.S. alone[21,22,23].

The FDA granted VTS-270 its Orphan Drug Designation, and the resulting seven years' exclusivity would be applied upon approval of the drug. The European Medicines Agency (EMA) also granted VTS-270 Orphan Drug status. In addition, the FDA granted the compound its Breakthrough Designation[24], indicating the drug is (1) intended to treat a serious or life-threatening disease or condition alone or combined with one or more other drugs, and (2) preliminary clinical evidence indicates it may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints. The Breakthrough Designation status results in expedited review by the agency.

Additionally, since VTS-270 has been designated as a rare pediatric disease treatment, it is expected – upon successful completion of the VTS-270 Phase 3 trial and submission of the regulatory filing and subsequent approval of the New Drug Application (NDA) by the FDA – that the company would receive a Priority Review Voucher, awarded by the agency to those sponsors that meet certain criteria[25]. Once received, the voucher could be redeemed by Mallinckrodt to receive priority review of a subsequent separate product's marketing application, or the company could choose to monetize the voucher. If the company receives the voucher and chooses to monetize it, a part of the proceeds would be shared with VTS-270's former owner's (Vtesse Inc.) shareholders.

Results of the VTS-270 Phase 1/2a data showed the potential for a disease modifying effect based on slowing of progression on neurological, disease-specific outcomes measures and promising clinical improvements in patients with NPC. Current therapeutic approaches are palliative and show limited evidence of efficacy in delaying disease progression [26,27]. If approved, VTS-270

will provide patients with a directly targeted disease-modifying therapy. The Phase 3 trial is ongoing, with the NDA filing currently expected in 2018, and approval anticipated in 2019. Mallinckrodt will acquire global rights to the therapy. Peak net sales for the product, if approved, are estimated at greater than $150 million.

***CPP-1X/sulindac*** is in Phase 3 development for Familial Adenomatous Polyposis (FAP) under a collaborative agreement between Cancer Prevention Pharmaceuticals (CPP) and Sucampo. FAP results from a genetic mutation leading to uncontrolled growth of hundreds to thousands of polyps in the lower digestive tract [28]. Left untreated, there is almost a 100% lifetime risk of developing colorectal cancer [29]. The disease typically progresses without clear warning signs until reaching advanced stages. It can also lead to abnormal manifestations in other organs including bone, skin, retina, teeth and other malignant lesions. FAP is a rare disease that affects 1 in 10,000 people with approximately 30,000 cases estimated in the U.S.[30] Of those diagnosed with FAP, approximately 70% are diagnosed with inherited disease[31], with the remaining 30% diagnosed separately and likely at a later stage.

The FDA granted CPP-1X/sulindac its Orphan Drug Designation, as well as its Fast Track designation, a process designed to facilitate development and expedite the review of drugs to treat serious conditions and fill an unmet medical need[32]. Orphan Drug status was also granted to the therapy by the EMA.

A Phase 2 Proof of Concept trial in FAP and a Phase 2/3 trial in high-risk polyp formers demonstrated the potential for CPP-1X/sulindac in patients with FAP[33]. Current therapeutic interventions are limited to endoscopies and surgeries[34], which only decrease polyp burden in the gastrointestinal tract and do not address other disease manifestations. CPP-1X/sulindac, if approved, will target the underlying disease mechanism, preventing polyp growth and delaying disease progression.

Completion of the Phase 3 trial is currently expected at the end of 2018. Assuming positive Phase 3 data Mallinckrodt would acquire the exclusive option to obtain North American commercial rights for a nominal fee, with CPP retaining rights to the rest of the world. The NDA filing is currently expected in early 2019, with approval also anticipated in 2019. Peak U.S. potential net sales for the product are estimated at greater than $300 million. A part of the profits from commercialization of CPP-1X/sulindac would be shared with CPP.

"Both NPC and FAP are devastating conditions associated with substantial morbidity and mortality, and effective therapies are needed," said Steven Romano, M.D., Chief Scientific Officer and Executive Vice President of Mallinckrodt. "In addition to the current patient benefits provided by AMITIZA, we look forward to bringing VTS-270 and CPP-1X/sulindac to

patients with critical unmet medical needs."

**Commercialization**

If approved, Mallinckrodt expects to build on the limited commercial infrastructure Sucampo has built for both VTS-270 and CPP- 1X/sulindac with its sales organizations currently focused on rare diseases. At launch, patient access to these unique treatment options would also be supported and enhanced by Mallinckrodt's strong relationships with insurance companies and group purchasing organizations. Mallinckrodt's existing infrastructure of clinical and medical affairs experts will also support approval and launch of both products.

**Financial Considerations and Closing**

Sun Acquisition Co., a subsidiary of Mallinckrodt, will commence a cash tender offer to purchase all of the outstanding shares of Sucampo Pharmaceuticals' common stock for $18.00 per share. The total transaction value (including anticipated payments in respect of Sucampo's debt) is approximately $1.2 billion. The acquisition is expected to be funded through borrowings under Mallinckrodt's existing revolving credit facility, a new secured term loan facility and/or cash on hand. Following the transaction, Mallinckrodt intends to utilize its significant cash generation to focus on reducing outstanding debt over time.

Sucampo stockholders holding approximately 32% of the outstanding Sucampo shares have entered into a tender and support agreement for this transaction.

Mallinckrodt expects accretion from the acquisition to adjusted diluted earnings per share of at least $0.30 in 2018 and at least double that amount in 2019, assuming a first quarter 2018 close.

Guidance on the impact of the acquisition to the company's GAAP[35] diluted earnings per share has not been provided due to the inherent difficulty of forecasting the timing or amount of items that would be included in calculating such impact.

The transaction is subject to customary closing conditions, including expiration of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act, and the tender of a majority of the outstanding Sucampo shares.

**Advisors**

Deutsche Bank served as Mallinckrodt's exclusive financial advisor; Wachtell, Lipton, Rosen & Katz served as its exclusive legal advisor. Jefferies LLC served as Sucampo's exclusive financial advisor; Cooley LLP served as its

exclusive legal advisor.

**ABOUT SUCAMPO**

Sucampo Pharmaceuticals, Inc. is a biopharmaceutical company focused on the development and commercialization of highly specialized medicines. Sucampo has a late-stage pipeline of product candidates in clinical development for orphan disease areas, including VTS-270, a mixture of 2-hydroxypropyl-B-cyclodextrins with a specific compositional fingerprint that has been granted orphan designation in the U.S. and Europe and is in a pivotal Phase 2/3 clinical trial for the treatment of Niemann-Pick Disease Type C, a rare progressive genetic disorder. VTS-270 has also been granted breakthrough therapy designation in the U.S. Sucampo has an exclusive option for the North American rights to CPP-1X/sulindac, which is in Phase 3 development for the treatment of familial adenomatous polyposis and has been granted orphan drug designation in the U.S. The company has two marketed products – AMITIZA and RESCULA. For more information, please visit www.sucampo.com.

**ABOUT MALLINCKRODT**

Mallinckrodt is a global business that develops, manufactures, markets and distributes specialty pharmaceutical products and therapies. Areas of focus include autoimmune and rare diseases in specialty areas like neurology, rheumatology, nephrology, pulmonology and ophthalmology; immunotherapy and neonatal respiratory critical care therapies; and analgesics and hemostasis products. The company's core strengths include the acquisition and management of highly regulated raw materials and specialized chemistry, formulation and manufacturing capabilities. The company's Specialty Brands segment includes branded medicines and its Specialty Generics segment includes specialty generic drugs, active pharmaceutical ingredients and external manufacturing. To learn more about Mallinckrodt, visit www.mallinckrodt.com.[1]

23.    The Offer Price in the Proposed Transaction is unfair and inadequate, because, among other things, the intrinsic value of the Company and its common stock is materially in excess of the amount offered given the Company's prospects for future growth and earnings.  As a result, the Proposed Transaction will deny Class Members their right to fully share equitably in

---

[1] Sucampo Pharmaceuticals, Inc., Current Report (Form 8-K), at Exhibit 99.1 (Joint Press Release of Sucampo Pharmaceuticals, Inc. and Mallinckrodt plc, dated December 26, 2017) (Dec. 26, 2017).

the true value of the Company.

24.     In fact, even the valuation analyses conducted by Jefferies in its fairness opinion indicate that the value of Sucampo's common stock has substantially greater value than represented by the Offer Price.  For example, Jefferies' illustrative sensitivities reflecting the potential impact of the new U.S. tax reform on the *Discounted Cash Flow Analysis* indicates a per share value as high as $20.20, which illustrates that each share of Sucampo common stock has an inherent premium of ***112%*** over the $18.00 Merger Consideration.

25.     In sum, the Offer Price appears to inadequately compensate Sucampo stockholders because, among other things, the intrinsic value of the Company's common stock is materially in excess of the Offer Consideration.  Given the Company's growth potential, development assets, and its intellectual property, it appears that the $18.00 per share Offer Price is not fair compensation for Sucampo stockholders.  Clearly, the Offer Price denies Class members their right to fully share equitably in the true value of the Company.

26.     It is therefore imperative that Sucampo public common shareholders receive the material information (discussed in detail below) that has been omitted from the 14D-9, which is necessary for the Company's stockholders to properly exercise their corporate suffrage rights and make a fully informed decision concerning whether to tender their shares in the Proposed Transaction.

**II.    The Merger Agreement's Deal Protection Provisions Deter Superior Offers**

27.     The Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Sucampo.

28.     First, the Merger Agreement contains a no solicitation provision that prohibits the

Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Sucampo stockholders.  Specifically, the Merger Agreement generally states that the Company and the Individual Defendants shall not: (i) solicit, initiate, or knowingly facilitate or knowingly encourage any inquiries regarding, or the making of any proposal or offer that constitutes, or could reasonably be expected to lead to, an acquisition proposal; (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any other person any information in connection with or for the purpose of soliciting, knowingly encouraging or facilitating, an acquisition proposal or any proposal or offer that could reasonably be expected to lead to an acquisition proposal.[2]

29.     Furthermore, the Company and the Individual Defendants must notify within 24 hours, orally or in writing, any inquiries, proposals, or offers with respect to, or that could reasonably be expected to lead to, an acquisition proposal.  *See id.* at *42.

30.     Additionally, the Merger Agreement grants Mallinckrodt recurring and unlimited matching rights, which provides it with four days to negotiate with Sucampo, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.  *See id.* at *44.

31.     The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Mallinckrodt can easily foreclose a competing bid.  As a result, these provisions unreasonably favor Mallinckrodt, to the detriment of Sucampo's public common stockholders.

---

[2] Sucampo Pharmaceuticals, Inc., Current Report (Form 8-K), at Exhibit 2.1 at *41 (Agreement and Plan of Merger, dated as of December 23, 2017, by and among Sucampo Pharmaceuticals, Inc., Mallinckrodt plc and Sun Acquisition Co.) (Dec. 26, 2017).

32.     The Merger Agreement also provides that Sucampo must pay Mallinckrodt a termination fee of $44,000,000 under certain conditions, including in the event Sucampo elects to terminate the Merger Agreement to pursue a superior proposal.  *See id.* at *60.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Sucampo stockholders with a superior offer

33.     Ultimately, these preclusive deal protection provisions restrain Sucampo's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company

34.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Sucampo's public common stockholders receive all material information necessary for them to make a fully informed decision concerning whether to tender their shares in the Proposed Transaction.

## III.     The Materially Incomplete and Misleading 14D-9

35.     On January 16, 2018, the Defendants filed a materially incomplete and misleading 14D-9 with the SEC and disseminated it to Sucampo's stockholders.  The 14D-9 solicits the Company's shareholders to tender their shares in connection with the Tender Offer.  Defendants were obligated to carefully review the 14D-9 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the 14D-9 misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to tender their shares in connection with the Tender Offer.

***Material Omissions Concerning Sucampo's Financial Projections***

36.     The 14D-9 discloses financial projections for Sucampo.  14D-9 23-26.  However,

the 14D-9 fails to provide material information concerning Sucampo's financial projections, which were relied upon by the Board in recommending that Sucampo stockholders tender their shares in favor of the Tender Offer.

37.     The 14D-9 provides several non-GAAP financial metrics, including EBIT and Unlevered Free Cash Flows, but fails to provide the line items for the metrics used to calculate these non-GAAP measures, including: (i) cost of goods and operating expenses; (ii) selling and marketing expense; (iii) research and development costs; (iv) general and administrative expenses; (v) royalty payments; (vi) intangible assets amortization; (vii) CPP-1X/sulindac profit sharing with Cancer Prevention Pharmaceuticals; (viii) depreciation and amortization; (ix) stock-based compensation; (x) capital expenditures; (xi) changes in net working capital.  14D-9 24-26.

38.     The omission of the above-referenced projections renders the financial projections included in the 14D-9 materially incomplete and misleading.  If a recommendation statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Sucampo's stockholders are required to decide whether they should forever relinquish their equity in the Company and forego the opportunity to participate in the Company's future earnings and growth in exchange for the Offer Price.  Thus, the above-mentioned information is plainly material.

39.     As a result, in order to make the Projections included on pages 24 through 26 of the 14D-9 materially complete and not misleading, Defendants must provide Sucampo stockholders with a reconciliation table of the non-GAAP measures to their most comparable

GAAP measures or the line items used to calculate the non-GAAP financial measures disclosed in the 14D-9.

***Material Omissions Concerning Jefferies' Financial Analysis***

40.     First, the 14D-9 describes Jefferies' fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Jefferies' fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, Sucampo's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Sucampo's fairness opinion in determining whether to tender their shares in favor of the Tender Offer.  This omitted information, if disclosed, would significantly alter the total mix of information available to Sucampo's stockholders.

41.     With respect to Jefferies' *Discounted Cash Flow Analysis*, the 14D-9 fails to disclose the following key components used in the analysis: (i) Sucampo's net operating loss carryforwards and certain other tax attributes; (ii) Sucampo's implied terminal value; (iii) the inputs and assumptions underlying the selection of the selected range of perpetuity growth rates of (5.0%) to (15.0%); and (iv) the inputs and assumptions underlying the selection of the discount rate range of 11.0% to 12.0%.  *See* 14D-9 30.

42.     Likewise, with respect to Jefferies' illustrative sensitivities analysis, which reflects the potential impact of the new U.S. tax reform on the *Discounted Cash Flow Analysis*, the 14D-9 fails to disclose the following key components used in the analysis: (i) the inputs and assumptions underlying the selection of the discount rate range of 11.0% to 12.1%; and (ii) the inputs and assumptions underlying the selection of the selected range of perpetuity growth rates of (5.0%) to (15.0%).  *See* 14D-9 31.

43.     These key inputs are material to Sucampo's common stockholders, and their omission renders the summary of Jefferies' *Discounted Cash Flow Analysis* and the illustrative sensitivities analysis incomplete and misleading.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars…. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

44.     With respect to Jefferies' *Selected Public Companies Analysis*, the 14D-9 fails to disclose the individual multiples Jefferies' calculated for each public company evaluated and utilized to render an implied per share equity value reference range.

45.     Similarly, with respect to Jefferies' *Selected Precedent Transactions Analysis*, the 14D-9 fails to disclose the individual multiples Jefferies' calculated for each transaction evaluated and utilized to render an implied per share equity value reference range.

46.     With respect to Jefferies' *Selected Public Companies Analysis* and *Selected Precedent Transactions Analysis*, the omission of the individual multiples renders the summary of these analyses and the implied equity reference value ranges materially misleading.  A fair summary of theses analyses requires the disclosure of the individual multiples for each company and transaction; merely providing the range that a banker applied is insufficient, as Sucampo stockholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied equity reference value ranges.

47.     With respect to Jefferies' implied premiums paid analysis, the 14D-9 fails to disclose the selected mergers and acquisition transactions that were analyzed, let alone how many transactions were evaluated, and the individual premiums used to prepare the comparative analysis.  A fair summary of this analysis requires the disclosure of the individual premiums for each transaction observed.   Merely providing a high/low range is insufficient, as Sucampo stockholders are unable to assess whether the banker summarized fairly, or, instead, emphasize only the figures that best present the premia in light of the Offer Price, *i.e.* as low as possible.  The omission of this information renders the summary of this analysis in the 14D-9 materially incomplete and misleading.

48.     Finally, complete disclosure of the above-mentioned information omitted from the 14D-9 is particularly important for Sucampo public common stockholder in light of the fact that the Company's stockholders are being asked to tender their shares in the Tender Offer, which has been unanimously endorsed by the Board, that, if consummated, will cause Sucampo stockholders to be cashed out of the Company and deny them their right to fully share equitably in the true value of the Company.

49.     In sum, the omission of the above-referenced information renders the 14D-9 materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the expiration of the Tender Offer, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to tender their shares in the Tender Offer, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violation of Section 14(e) of the Exchange Act)

50.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

51.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

52.     Defendants violated § 14(e) of the Exchange Act by issuing the 14D-9 in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the tender offer commenced in conjunction with the Proposed Transaction.  Defendants knew or recklessly disregarded that the 14D-9 failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53.     The 14D-9 was prepared, reviewed, and/or disseminated by Defendants.   It misrepresented and/or omitted material facts, including material information about the

consideration offered to stockholders via the tender offer, the intrinsic value of the Company, and potential conflicts of interest faced by certain Individual Defendants.

54.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e).  The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the 14D-9, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

55.     The omissions and incomplete and misleading statements in the 14D-9 are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares or seek appraisal.  In addition, a reasonable investor would view the information identified above which has been omitted from the 14D-9 as altering the "total mix" of information made available to stockholders.

56.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the 14D-9, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the 14D-9, rendering certain portions of the 14D-9 materially incomplete and therefore misleading.

57.     The misrepresentations and omissions in the 14D-9 are material to Plaintiff, and Plaintiff will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

## COUNT II

**(Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act
and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9)**

58.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

59.    Defendants have caused the 14D-9 to be issued with the intention of soliciting stockholder support of the Proposed Transaction.

60.    Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.   Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

61.    SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

62.    In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

63.    The 14D-9 violates Section 14(d)(4) and Rule 14d-9 because it omits material facts,

including those set forth above, which omissions render the 14D-9 false and/or misleading. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the 14D-9, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the 14D-9, rendering certain portions of the 14D-9 materially incomplete and therefore misleading.

64. The misrepresentations and omissions in the 14D-9 are material to Plaintiffs, and Plaintiffs will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

65. The misrepresentations and omissions in the 14D-9 are material to Plaintiffs, and Plaintiffs will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

## COUNT III

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

66. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

67. The Individual Defendants acted as controlling persons of Sucampo within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Sucampo, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the 14D-9, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the

various statements that Plaintiff contends are materially incomplete and misleading.

68.     Each of the Individual Defendants was provided with or had unlimited access to copies of the 14D-9 by Plaintiff to be misleading prior to the date the 14D-9 was issued, and had the ability to prevent the issuance of the false and misleading statements or cause the statements to be corrected.

69.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The 14D-9 at issue contains the unanimous recommendation of each of the Individual Defendants that shareholders tender their shares in the Tender Offer.  They were thus directly involved in preparing this document.

70.     In addition, as the 14D-9 sets forth, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the merger agreement.  The 14D-9 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

71.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

72.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Sections 14(e) and 14(d)(4) and Rule 14d-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably

harmed.

73.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from closing the Tender Offer or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the 14D-9;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 18, 2018

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

**OF COUNSEL:**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner

*/s/ Donald J. Enright*
Donald J. Enright (Bar No. 13551)
Elizabeth K. Tripodi
1101 30th Street, N.W., Suite 115
Washington, DC 20007

The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com

*Attorneys for Plaintiff*

T: (202) 524-4290
F: (202) 333-2121
Email: denright@zlk.com
        etripodi@zlk.com

*Attorneys for Plaintiff*